IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ERNEST MELO, *on behalf of himself*
*and all others similarly situated,*
    Plaintiff,

    v.                                   Civil No. 3:19cv621 (DJN)

ZUMPER, INC., *et al.,*
    Defendants.

## MEMORANDUM OPINION

Plaintiff Ernest Melo ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action against Zumper, Inc. ("Zumper") and Trade House Data ("Trade House") (collectively, "Defendants"), alleging various violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* This matter comes before the Court on Zumper's Motion to Transfer Venue and to Stay Proceedings Pending Arbitration (ECF No. 11) and Trade House's Joinder in Motion to Stay Pending Arbitration (ECF No. 34). For the reasons set forth below, the Court hereby GRANTS Zumper's Motion to Transfer Venue and to Stay Proceedings Pending Arbitration (ECF No. 11) and DENIES WITHOUT PREJUDICE Trade House's Joinder in Motion to Stay Pending Arbitration (ECF No. 34).

## I.    BACKGROUND

### A.    Factual Allegations.

Zumper is a corporation organized under Delaware law with its principal place of business in San Francisco, California. (Affidavit of Brian Coyne in Supp. of Def.'s Mot. to Transfer Venue and to Stay Proceedings Pending Arbitration ("Coyne Aff.") (ECF No. 12-1)

¶ 2.) The company operates a real estate website that allows individuals throughout the United States and Canada to search for rental apartments and to connect with landlords and realtors. (Coyne Aff. ¶ 2.) Through the website, potential renters may request that Zumper gather credit, criminal and eviction records from third-party sources and transmit those records to landlords and realtors for evaluation. (Coyne Aff. ¶ 2.) Further, through the website, landlords can communicate with and evaluate prospective tenants. (Coyne Aff. ¶ 2.) Trade House is a corporation headquartered in Sandy, Utah. (Compl. ¶ 10.) Plaintiff alleges that Trade House operates as a consumer reporting agency and regularly assembles, evaluates and publishes consumer information and reports to third parties. (Compl. ¶ 11.)

In August 2017, Plaintiff, a resident of Virginia, applied to rent a condominium. (Compl. ¶¶ 6, 13.) At the time, the leasing agent "requested Plaintiff's consumer report through Zumper's online tenant screening resource." (Compl. ¶¶ 13-14.) Zumper's records show that on August 28, 2017, a realtor sent Plaintiff a request via Zumper to "create a Credit Report and to run a background screen." (Coyne Aff. ¶ 6.) Zumper's internal records reveal that "Ernest Martin de Jesus Melo" created a Zumper account on August 28, 2017. (Coyne Aff. ¶ 20). Plaintiff subsequently ordered and paid fifty dollars for Zumper to send credit, criminal and eviction reports to his prospective landlord. (Coyne Aff. ¶ 32.)

Zumper then obtained Plaintiff's requested records from Trade House. (Compl. ¶ 15). Zumper shared with the prospective landlord a consumer report that, according to Plaintiff, included derogatory reports that did not belong to him. (Compl. ¶¶ 16-17.) Plaintiff alleges that due to Zumper's failure to maintain procedures to ensure maximum accuracy, Zumper incorrectly reported Plaintiff's father's information instead of his own. (Compl. ¶¶ 17-18.) Because of this error, Plaintiff states that he could not secure the rental property and remained

further deterred from applying for other rental properties because of the inaccurate records. (Compl. ¶ 19.) Finally, following this incident, Plaintiff reports requesting a copy of his consumer file; however, Plaintiff asserts, Zumper did not respond to the request. (Compl. ¶¶ 20-21.)

According to Zumper's records, Plaintiff used a Samsung Galaxy S8 running the Google Chrome web browser to create his Zumper account. (Coyne Aff. ¶ 24.) When a prospective user, like Plaintiff, receives a request from a landlord, the user clicks a blue "Get Started" button that takes him to a website to create his account. (Coyne Aff. ¶¶ 8-10.) According to Zumper records, this website had a pink "Create an Account" button. (Coyne Aff. ¶ 10.) Clicking this button produces a pop-up window that prompts a user to enter a name and password. (Coyne Aff. ¶ 10.) A rendition of what the website would have looked like to a user creating an account in August 2017 appears below.[1]

---

[1]     Zumper concedes that while "conceivable" that Plaintiff could have created the account by going to the Zumper home page and independently navigating to the create an account window, it is unlikely and, moreover, according to Zumper, either way that Plaintiff chose to make an account, he would have ended up at the website pictured. (Coyne Aff. at 4 n.3.)



(Coyne Aff. at 5.) Below the "Create Account" button, a prospective user sees the following language without having to scroll down: "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." (Coyne Aff. ¶ 13.) Zumper asserts that a prospective user cannot create an account without entering the required information and affirmatively clicking the blue "Create Account" button. (Coyne Aff. ¶ 12.)

The words "Terms and Conditions" and "Privacy Policy" appeared in blue to indicate that they were hyperlinks. (Coyne Aff. ¶ 14.) Clicking on the "Terms and Conditions" hyperlink took a user to Zumper's Terms of Use. (Coyne Aff. ¶ 15.) According to Zumper, the Terms of Use as they existed on August 28, 2017, the day that Plaintiff created his account, included an agreement to binding arbitration and, to the extent that the claims were not arbitrable, exclusive venue in the federal or state courts in

4

San Francisco. (Coyne Aff. ¶ 27; Ex. D to Coyne Aff. (the "Agreement") (ECF No. 12-5) at 16-17.) Section 14 of the Agreement, entitled "Arbitration and Dispute Resolution," provided:

> All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration before a single arbitrator (the "Arbitrator") in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in effect (for information on the AAA and its rules, see www.adr.org.) and the further procedures set forth herein, except that each party retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights.
>
> . . .
>
> Notwithstanding the foregoing, you may at your option file an individual claim in any small claims court for disputes or claims within the scope of its subject matter jurisdiction if such court has personal jurisdiction. Zumper does not hereby waive any defense that such jurisdiction may be lacking in your state. Without derogation of the parties' obligation to arbitrate as set forth herein, for any claims other than those in small claims court, jurisdiction for any court proceedings arising out of or relating to this Agreement, the Website or the Services shall be vested exclusively in, and venue shall be laid in, the state or federal courts sitting [in] San Francisco, California except that, following confirmation of an arbitration award in a state or federal court in San Francisco, California, a judgment arising therefrom may be executed in any court of competent jurisdiction.

(Agreement at 16-17.)

### B.     Plaintiff's Complaint.

On August 22, 2019, Plaintiff filed this Complaint (ECF No. 1) against Defendants, setting forth three claims for relief. In Count I, Plaintiff alleges that Trade House violated 15 U.S.C. § 1681e(b) by failing to "maintain reasonable procedures to ensure the maximum possible accuracy of the consumer credit information it reported." (Compl. ¶ 24.) Similarly, in Count II, Plaintiff alleges that Zumper violated 15 U.S.C. § 1681e(b) by failing to "maintain reasonable

procedures to ensure the maximum possible accuracy of the consumer credit information it reported." (Compl. ¶ 28.)

Finally, in Count III, Plaintiff asserts that Zumper violated 15 U.S.C. § 1681g when it failed to provide Plaintiff a response to his written request for his consumer file, failed to disclose the "source of the judgment information contained in his consumer report" and failed to "identify each person that procured the Plaintiff's report during the preceding [one]-year period." (Compl. ¶ 32.) Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings Count III on behalf of himself and a putative class defined as:

> All natural persons residing in the United States (a) who requested their consumer disclosure from Zumper, (b) within the two year period preceding the filing of this action and during its pendency, and (c) to whom Zumper failed to provide a response that included the source of the judgment information that appeared in the consumer's file.

(Compl. ¶ 33.) Under all three counts, Plaintiff asserts that he is entitled to recover actual damages, statutory damages and punitive damages, in addition to costs and attorneys' fees. (Compl. ¶¶ 26, 30, 41.)

## C.     Defendant Zumper's Motion to Transfer Venue and Stay Proceedings.

In response to Plaintiff's Complaint, on September 24, 2019, Zumper filed a Motion to Transfer Venue and to Stay Proceedings Pending Arbitration. (ECF No. 11). Zumper moves to transfer this entire action to the United States District Court for the Northern District of California. (Def. Zumper, Inc.'s Mem. in Supp. of its Mot. to Transfer Venue and to Stay Proceedings Pending Arbitration ("Def.'s Mem.") (ECF No. 12) at 1.) Zumper first asserts that Plaintiff agreed to arbitration or to exclusive venue in the Northern District of California when he created an account and accepted the terms of the Agreement. (Def.'s Mem. at 1.)

Alternatively, Zumper asserts that the Court should transfer the venue of the claims pursuant to 28 U.S.C. § 1404(a), because of "efficiency and the interests of justice." (Def.'s Mem. at 1.)

On October 29, 2019, Plaintiff filed a Memorandum in Opposition to Defendant Zumper's Motion to Transfer Venue and to Stay Proceedings Pending Arbitration ("Pl.'s Mem.") (ECF No. 23). Plaintiff contends that he is not subject to arbitration or to jurisdiction in the Northern District of California, because Plaintiff did not enter into a valid contract, nor accept any terms and conditions. (Pl.'s Mem. at 2.) Plaintiff further challenges the admissibility and sufficiency of Zumper's evidence — namely, the Coyne Affidavit. (Pl.'s Mem. at 4-9.) Plaintiff also asserts that a transfer of venue would cause undue hardship for him and his cause of action. (Pl.'s Mem. at 2.) Alternatively, Plaintiff submits that even if the Court found that he knowingly entered into a contract, the contract contains conflicting clauses such that the Court should find that the "purported contract" fails for impossibility. (Pl.'s Mem. at 2.)

Plaintiff next argues that Count III of the Complaint, an alleged violation of 15 U.S.C. § 1681g, does not fall within the scope of the Agreement. (Pl.'s Mem. at 2.) Finally, Plaintiff submits that transfer to the Northern District of California to consolidate with the then-pending class action, *Gonzalez-Torres v. Zumper*, would cause "significant and undue prejudice" to Plaintiff's case and would be inappropriate because the cases present different legal theories and causes of actions.[2] (Pl.'s Mem. at 3.)

In response, Defendant Zumper filed a Reply Memorandum in Support of its Motion to Transfer Venue and to Stay Proceedings Pending Arbitration ("Def.'s Reply") (ECF No. 24) on November 4, 2019. Zumper asserts that a venue transfer proves warranted before the Court even

---

[2]     Since the parties filed their briefs, the Northern District of California issued an order in the related case, granting Zumper's Motion to Compel Arbitration and Stay Proceedings. *Gonzales-Torrez v. Zumper, Inc.*, 2019 WL 6465283 (N.D. Cal. Dec. 2, 2019).

reaches the question of whether Plaintiff entered into a contract. (Def.'s Reply at 2.) Further, Defendant reasserts that Plaintiff did in fact enter into a contract with Zumper and, in doing so, agreed to the terms in the Agreement, including the arbitration and venue clauses. (Def.'s Reply at 6.) Defendant further contends that all of Plaintiff's claims remain subject to the arbitration and venue clauses and that the contract does not include contradictory terms requiring it to fail for impossibility. (Def.'s Reply at 16-17.) Finally, Defendant asserts that if the Court does not stay the case pending arbitration, the Court must conduct a summary trial to determine whether Plaintiff agreed to Zumper's terms. (Def.'s Reply at 19.)

**D.      Defendant Trade House's Joinder in Motion to Stay Pending Arbitration.**

On December 30, 2019, Trade House filed a Joinder in Motion to Stay Pending Arbitration (Def. Trade House Data's Joinder in Mot. to Stay Pending Arbitration ("Trade House Motion") (ECF No. 34)), moving this Court to join in Zumper's Motion. Trade House argues that, because Plaintiff consented to a broad arbitration agreement, agreeing to arbitrate "[a]ll disputes arising out of or relating to this Agreement, the Website or the Services," the Court should compel arbitration and stay the action in its entirety. (Trade House Mot. at 2-3.) While Trade House explicitly joins Zumper in its motion to stay the case pending arbitration, Trade House does not object to Zumper's motion to transfer venue. (Trade House Mot. at 1 n. 2.)

### III.      PLAINTIFF'S EVIDENTIARY OBJECTIONS

Because the admissibility of the parties' evidence informs the final determination, the Court first considers Plaintiff's objections to Defendant Zumper's evidence — namely, his objections to the Affidavit of Brian Coyne in Support of Defendant's Motion to Transfer Venue and Stay Proceedings Pending Arbitration ("Coyne Affidavit"). The Coyne Affidavit explains in detail what a prospective user in Plaintiff's position would have seen when creating a Zumper

account, as well as the Plaintiff-specific data that Zumper captured when Plaintiff created his account. Plaintiff charges that the statements made in the Coyne Affidavit are speculative, hearsay and lack foundation. (Pl.'s Mem. at 7.) Plaintiff further challenges that Coyne based his testimony in part "on screenshots created by some other mystery Zumper employee" that do not support Zumper's assertion that Plaintiff entered into a valid contract. (Pl.'s Mem. at 7.)

Zumper asserts that the Coyne Affidavit constitutes admissible evidence. (Def.'s Reply at 11-15.) Zumper argues that Coyne properly based his affidavit on personal knowledge and a review of Zumper's business records. (Def.'s Reply at 11-12.) Furthermore, Zumper asserts, Coyne properly authenticated the screenshots included in his affidavit. (Def.'s Reply at 12-13.) Zumper contends that it does not need to provide evidence "from a witness standing over [Plaintiff]'s shoulder," and, moreover, the Coyne Affidavit contains neither hypothetical nor speculative testimony. (Def.'s Reply at 13-15.)[3]

### A. Standard of Review.

As a general rule, pursuant to Federal Rule of Civil Procedure 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).[4] Federal Rule of Evidence 602 instructs

---

[3] The Court notes that in a nearly analogous case, recently before the Northern District of California, Zumper submitted similar affidavits — including one from Brian Coyne —that the court ultimately relied on in its analysis. *Gonzalez-Torres v. Zumper*, Inc., 2019 WL 6465283 (N.D. Cal. Dec. 2, 2019).

[4] Rule 56(c)(4) acts as the standard bearer for affidavits even outside the motion for summary judgment context. Indeed, courts routinely cite Rule 56(c)(4) and case law explaining the Rule 56(c)(4) standard in cases involving motions to transfer and motions to compel arbitration. *See, e.g., Del Zotto v. Universal Physician Services, LLC*, 214 F. Supp. 3d 499, 503-04 (D.S.C. 2016) (citing, in the motion to transfer venue context, Fourth Circuit precedent

that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Furthermore, an "affiant's personal knowledge may be based on review of files, if the testimony states facts reflected by the files." *Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 140 (D. Md. 2019). Moreover, in regard to business records submitted with an affidavit, "[i]t is well established that employees who are familiar with the record-keeping practices of a business are qualified to speak from personal knowledge that particular documents are admissible business records, and affidavits sworn by such employees constitute appropriate . . . evidence." *Mundo-Violante v. Kerry*, 180 F. Supp. 3d 442, 448 (W.D. Va. 2016) (quoting *Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008) (citing Fed. R. Evid. 803(6))). Finally, affidavits submitted in support of a motion may not be conclusory or based upon hearsay. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Barwick v. Celotex Corp.*, 736 F.2d 946, 959-60 (4th Cir. 1984).

**B.     Analysis.**

In his affidavit, Brian Coyne properly affirms that he based his testimony on his "personal knowledge or [his] review of the records of Zumper, Inc." (Coyne Aff. at 1.) Coyne acts as the Chief Business Officer at Zumper, a position that he has held for over six years. (Coyne Aff. ¶ 1; Ex 2 to Pl.'s Mem. in Opp. to Def. Zumper Inc.'s Mot. to Transfer Venue and Stay Proceedings Pending Arbitration ("Pl. Ex. 2") (ECF No. 23-2) at 1.) In his affidavit, he explains that the records that he reviewed were "regularly made and maintained in the ordinary course of Zumper's business by persons with knowledge at or near the times of the matters

---

explaining the Rule 56(c)(4) standard); *Gibbs v. Stinson*, 2019 WL 4752792, at \*22 (E.D. Va. Sept. 30, 2019) (citing Rule 56(c)(4) in the arbitration context).

recorded therein."[5] (Coyne Aff. at 1.) Finally, he also states that he has "personal knowledge regarding the appearance and function of the Zumper website . . . [and] the operation of the systems through which user information is submitted to Zumper and stored by Zumper, including the process for creating new user accounts." (Coyne Aff. ¶ 3.)

To the extent that Plaintiff argues that Coyne's background does not qualify him to speak to the technical aspects of Zumper's business, the Court finds that Coyne has properly demonstrated his own knowledge. His detailed testimony appropriately reflects his personal knowledge. *See* Fed. R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own testimony."). Furthermore, Coyne properly enhanced his personal knowledge with a review of appropriate business records and his testimony reflects the facts in those records. *Sanchez Carrera*, 402 F. Supp. 3d at 140. Moreover, Coyne's Affidavit does not include discussion of any hyper-technical aspects or functions of Zumper's website that would require significant technical expertise not normally possessed by a Chief Business Officer.

---

[5]     The Court finds that the records attached to the affidavit and referenced therein as admissible business records pursuant to the business record hearsay exception. Fed. R. Evid. 803(6). As affirmed by Coyne, the Zumper data records were "made at or near the time" at issue by someone with knowledge and they were made and kept as part of Zumper's regular business practices. Fed. R. Evid. 803(6). Moreover, Coyne properly testified to all of these conditions in his affidavit. *Nader*, 549 F.3d at 963 ("It is well established that employees who are familiar with the record-keeping practices of a business are qualified to speak from personal knowledge that particular documents are admissible business records, and affidavits sworn by such employees constitute appropriate . . . evidence."); *see also Rambus, Inc. v. Infineon Tech. AG*, 348 F. Supp. 2d 698, 702 (E.D. Va. 2016) (explaining that a witness proves qualified to certify a business record if he can attest to an understanding of the record itself and the record keeping system). While Plaintiff takes issue with the fact that Coyne is not the "custodian" of these records, the Fourth Circuit has held that an affiant does not need to be the custodian to establish that records are admissible business records. *Nader*, 549 F.3d at 963; *see also Gen. Ins. Co. of Am. v. United States Fire Ins. Co.*, 886 F.3d 346, 358 (4th Cir. 2018) (stating that a qualified witness who can testify to the requirements of Fed. R. Evid. 803(6)(A)-(C) "need not have personally participated in the creation of the document, nor know who actually recorded the information").

Plaintiff further suggests that because Coyne did not actually witness what Plaintiff saw on his screen, Coyne's testimony presents — at best — mere speculation. Once again, the Court finds this argument unpersuasive. As explained above, Coyne based his testimony not only on his own personal knowledge of Zumper, but also on business records that reflect data about how Plaintiff created his account and what he would have seen.

Indeed, Coyne testified that Zumper regularly subscribes to a service that, as part of the regular course of business, maintains a repository of the Zumper website as it has appeared in the past. (Coyne Aff. ¶ 3.) Further, Zumper keeps internal records of all account information and creation. (Coyne Aff. ¶ 20.) These records include information such as the type of browser and type of device an account holder used to create his account. (Coyne Aff. ¶¶ 20-24.) Coyne also included screenshots depicting what Plaintiff would have seen, based on these records. Courts across the country, facing issues of e-commerce contracts, have regularly and properly relied on these types of records and have consistently allowed testimony by those with personal knowledge about what "would have appeared" on a user's screen. *See, e.g., Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 70-72 (2d Cir. 2017) (relying on screenshots and a declaration that represented that Uber maintained records from which the company could see what a user had seen and done); *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 988-989 (N.D. Cal. 2017) (relying on testimony about what a prospective user would have seen and had to do to create an account); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 834-35 (S.D.N.Y 2012) (allowing declarations with testimony and screenshots of what a user did and would have seen).

To the extent that Plaintiff argues that his own declaration proves dispositive of the Coyne Affidavit, the Court need not accept conclusory affidavits. *See, e.g., Barwick v. Celotex Corp.*, 736 F.2d 946, 959-60 (4th Cir. 1984) (determining that a conclusory affidavit that "[did]

12

not give specific facts, but only generalities" did not measure up to the requirements of Rule 56.

Furthermore, other courts have found that a plaintiff does not create a genuine issue of fact by

merely submitting an affidavit or declaration that simply denies an opposing affidavit and offers

no evidence to rebut the opposing facts. *See, e.g., Cordas v. Uber Technologies, Inc.*, 228 F.

Supp. 3d 985, 990 (N.D. Cal. 2017) ("[Plaintiff] offers no evidence to rebut [Defendant]'s

reasoned declaration other than his own conclusory allegations that he never received notice of

the terms and conditions and that [Defendant]'s declaration is false and inadequate."). Plaintiff

submitted his own declaration in opposition to Zumper's Motion. (Decl. of Ernest Melo ("Melo

Decl.") (ECF No. 23-1).) Nevertheless, a careful reading of the facts — not conclusions —

contained in the two documents demonstrates that Coyne's testimony does not conflict with

Plaintiff's. Plaintiff does not claim that the pop-up window referenced by Coyne did not appear

on his screen. (Coyne Aff. ¶ 11; Melo Decl. ¶¶ 4-8.) Moreover, Plaintiff does not claim that the

statement that "[b]y creating a Zumper account you indicate your acceptance of our Terms and

Conditions and Privacy Policy" did not appear on his phone. (Coyne Aff. ¶ 13; Melo Decl. ¶¶ 4-

8.) Instead, he testifies that Zumper never displayed an arbitration clause or forum-selection

clause to him. (Melo Decl. ¶¶ 5-6.) But, Coyne testified that these would have appeared only

after Plaintiff clicked the links. (Coyne Aff. ¶ 15.) Importantly, Plaintiff does not testify that he

clicked the link and, therefore, does not rebut Coyne's testimony that the Agreement would have

appeared. (Melo Decl. ¶¶ 4-8.) As such, Plaintiff has produced no evidence to rebut or cast

doubt on Coyne's testimony.

Finally, to the extent that Plaintiff challenges the authenticity of the screenshots included

in Coyne's affidavit, Coyne properly authenticated them with his own testimony. Plaintiff

appears to take issue because the screenshots were created by "some other mystery Zumper

employee." (Pl.'s Mem. at 7.)  To authenticate evidence, "the proponent [of the evidence] must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  The Federal Rules of Evidence explicitly state that an individual with personal knowledge may submit testimony authenticating the evidence.  Fed. R. Evid. 901(b)(1). Furthermore, the Fourth Circuit has held that the burden to authenticate under Rule 901 "is not high — only a prima facie showing is required." *Eschert v. City of Charlotte*, 2017 WL 3633275, at *6 (W.D. N.C. Aug. 23, 2017) (quoting *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (allowing screenshots of social media pages that had been certified by those with personal knowledge)).  Testimony by a person with personal knowledge of what the photograph should depict routinely authenticates those images. *See, e.g., Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 561 (D. Md. 2007) ("Photographs have been authenticated for decades under Rule 901(b)(1) by the testimony of a witness familiar with the scene depicted in the photograph who testifies that the photograph fairly and accurately represents the scene.").

Coyne has properly authenticated the screenshots in his sworn affidavit, especially in the absence of any evidence to cast doubt on the authentication of the screenshots.  Coyne affirms his personal knowledge of the appearance and functionality of the Zumper website and account creation process.  (Coyne Aff. ¶ 3.)  Consequently, the Court finds that Coyne has properly authenticated the screenshots that he relied upon in his affidavit and included therein.[6]

---

[6]     The Court notes that other courts facing similar issues have allowed the use of screenshots to demonstrate what a customer would have seen when creating an account. *See, e.g., Cordas*, 228 F. Supp. 3d at 989 ("[T]o the extent the screenshots [that defendant's employee] submitted required authentication, he has authenticated them with his testimony from personal knowledge."); *see also Worthington v. JetSmarter, Inc.*, 2019 WL 4933635, at *5-6 (S.D.N.Y. Oct. 7, 2019) ("When presented with arbitration agreements in contracts formed online between companies and their customers, courts routinely rely on affidavits and declarations . . . screenshots . . . submitted by the company's employee describing and depicting how the customer manifested assent to the company's . . . arbitration provision."); *Selden v.*

For the reasons set forth above, the Court finds Plaintiff's arguments challenging the Coyne Affidavit as "speculative, hearsay, and lack[ing] merit" unpersuasive and will consider the affidavit when addressing the motion to transfer.

## IV.    ZUMPER'S MOTION TO TRANSFER VENUE

Defendant Zumper asserts that the Court should transfer this entire action to the Northern District of California, because Plaintiff agreed to Zumper's terms when he created his Zumper account and, therefore, agreed to arbitrate his claims or, to the extent that arbitration did not apply, to exclusive venue in the Northern District of California. (Def.'s Mem. at 1.) Alternatively, Zumper moves for transfer pursuant to 28 U.S.C. § 1404, because of efficiency considerations and the interests of justice. (Def.'s Mem. at 1.) Plaintiff disputes that he entered into a valid contract and, therefore, he asserts that he never agreed to litigate potential claims in the Northern District of California. (Pl.'s Mem. at 2.) Furthermore, Plaintiff contends, transfer of venue would cause undue hardship for Plaintiff in presenting his case. (Pl.'s Mem. at 2.) The Court will first consider whether Plaintiff entered into a valid contract with Zumper.

### A.    Plaintiff Entered into a Valid Contract with Zumper.

Zumper argues that Plaintiff entered into a valid contract when he created a Zumper account and accepted the terms of the Agreement. (Def.'s Mem. at 10.) Plaintiff asserts that he never entered into such a contract. (Pl.'s Mem. at 4.)

---

*Airbnb, Inc.,* 2016 WL 6476934, at *2-5 (D.D.C. Nov. 1, 2016) (relying on employee affidavits and screenshots that depicted the customer's actions and what the customer would have seen on a website).

### i. *Standard of Review.*

General principles of state contract law govern the question of whether Plaintiff entered into a valid contract with Zumper.[7] Under Virginia law, offer, acceptance and consideration must exist to form a valid contract. *Snyder–Falkinham v. Stockburger*, 457 S.E.2d 36, 39 (Va. 1995). Further, "mutuality of assent . . . is an essential element of all contracts." *Lacey v. Cardwell*, 217 S.E.2d 835, 843 (Va. 1975) (quoting *Green's Ex'rs v. Smith*, 131 S.E. 846, 848 (1926)). A court should use an objective standard to determine whether a party assented to the terms of a contract. *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007). A court must consider the assenting "words or acts, not . . . [the party's] unexpressed state of mind." *Id.* (citing *Wells v. Weston*, 326 S.E.2d 672, 676 (1985)). Finally, a contract does not become less of a contract simply because a party entered into it electronically. *A.V. v. iParadigms, Ltd. Liability Co.*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008), *rev'd on other grounds*, 562 F.3d 630 (4th Cir. 2009).

### ii. *Analysis.*

The contract at issue here can be described as an online adhesion contract. *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016).[8] "While new commerce on the

---

[7]    The parties both agree that Virginia state law applies in this case. (Def.'s Mem at 11; Pl.'s Mem. at 7.)

[8]    There are many types of online adhesion contracts, including browsewrap, clickwrap and sign-in-wrap. *Selden*, 2016 WL 6476934, at *4. A browsewrap agreement does not require a user to click "I agree" to use the web services, but rather attempts to bind the user to hyperlinked terms simply through using the website. *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010). A "clickwrap" agreement is one in which a user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. *Selden*, 2016 WL 6476934, at *4. Finally, sign-in-wrap agreements occur when a prospective user signs up for a product or service and the screen states that the acceptance of the terms and conditions are required to access the product or service. *Id.* While the user has access to the terms and conditions via a hyperlink, the user does not have to read the terms and conditions before signing up. *Id.* Courts generally have looked more favorably upon clickwrap and sign-in-wrap agreements than browsewrap agreements. The contract at issue here most closely

Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). To enforce the agreement, Zumper must demonstrate the existence of an offer, an acceptance and consideration. Because the parties do not contest offer or consideration, the crux of the issue surrounds whether Plaintiff had knowledge of the terms of the offer — that is, the Agreement — and manifested assent to them.

"[M]ost courts have held web browser contracts enforceable where the user 'had actual or constructive knowledge of the site's terms and conditions, and . . . manifested assent to them.'" *Capital Concepts, Inc. v. Mountain Corp.*, 2012 WL 6761880, at *10 (W.D. Va. Dec. 30, 2012) (quoting *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010)) (alteration in original). Indeed, courts have consistently "recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'" *Meyer,* 868 F.3d at 75 (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016)).

When analyzing analogous agreements, courts consider a variety of factors to determine if a prospective user had reasonable notice that by creating an account, he would agree to the provider's terms and conditions. *Selden,* 2016 WL 6476934, at *4. Courts ask the crucial questions of whether the website presented the terms and conditions in a hyperlink, and whether that hyperlink appeared clearly to the user. *See, e.g., Meyer,* 868 F.3d at 79 ("As long as the

resembles a sign-in-wrap agreement. However, as the District of Columbia District Court properly noted, "[w]hile the relevant terminology continues to evolve, the Court's inquiry into contract formation does not." *Id.*

hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms."); *Cullinane v. Uber Techs, Inc.,* 893 F.3d 53, 63 (1st Cir. 2018) (noting that hyperlinks are "commonly blue and underlined.")

Next, courts consider the placement of the terms and conditions hyperlink in relation to the button that grants a user access to the service or product. *Selden,* 2016 WL 6476934, at *5. For example, a district court in South Carolina enforced a similar agreement, citing the location of the disclaimer in relation to the "Place your order" button. *Payne v. Amazon.com, Inc.,* 2018 WL 4489275, at *5 (D.S.C. July 25, 2018) ("[A] reasonably prudent offeree would know that he agreed to Amazon's Conditions of Use by clicking the 'Place your order' button when that button appeared directly next to or above a statement hyperlinking to conditions and the statement indicated the user agreed to those conditions by ordering.").[9]

Reviewing courts also consider whether the terms and conditions hyperlink appeared to the user on multiple occasions, even after the user signed up for the website or service. *Selden,* 2016 WL 6476934, at *5; *see also Berkson v. Gogo LLC,* 97 F. Supp. 3d 359, 401 (E.D.N.Y 2015) (explaining that sign-in-wrap agreements are usually upheld if "notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site.").

---

[9] *See also Fteja,* 841 F. Supp. 2d at 840 (finding that the user "was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences. That was enough."); *Swift v. Zynga Game Network, Inc.,* 805 F. Supp. 2d 904, 908, 912 (N.D. Cal 2011) (finding an arbitration clause binding where the terms of service statement was directly below the "Accept" button); *Starke v. Gilt Groupe, Inc.,* 2014 WL 1652225, at *2-3 (S.D.N.Y. Apr. 24, 2014) (finding terms binding when the "terms of use" statement was right next to the "Shop Now" button); *Crawford v. Beachbody, LLC,* 2014 WL 6606563, at *3 (S.D. Cal. Nov. 5, 2014) (finding a forum selection clause binding where the user clicked on a button marked "Place Order" and the notice of the terms and conditions was directly below the button); *but see Cvent, Inc.,* 739 F. Supp. 2d at 933 (finding an agreement unenforceable when the terms link appeared "buried at the bottom of the first page . . . and users must affirmatively scroll down to the bottom of the page to even see the link").

Finally, courts consider the overall design elements of the website, including font size and color, and other visual components that might hinder a user's reasonable notice. *Church v. Hotels.com L.P.*, 2018 WL 3130615, at *2 (D.S.C. June 26, 2018) ("[T]he hyperlinked disclaimer is presented in the same 'small gray font on a light gray background' as is the payment information that Plaintiff himself typed.").[10]

After a review of analogous online adhesion contracts, the Court finds that Plaintiff had — at the very least — constructive knowledge of Zumper's terms found in the Agreement and that by clicking "Create Account," he manifested assent to them. Even if Plaintiff did not read the Agreement, "[i]gnorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services." *Selden*, 2016 WL 6476934, at *5.

As outlined above, to use Zumper and request the reports as Plaintiff unequivocally did, Plaintiff must have created an account. (Coyne Aff. ¶ 2.) Plaintiff created his account on August 28, 2017, according to Plaintiff's own admissions and Zumper's internal records. (Compl. ¶¶ 13-14; Coyne Aff. ¶ 6.) Plaintiff created his account using the Google Chrome web browser on his Samsung Galaxy S8 mobile device. (Coyne Aff. ¶ 24.) According to Zumper's internal business records, at some point during the process of account creation, Plaintiff would have been confronted with a pop-up window that directed him to create an account. (Coyne Aff. ¶¶ 10-11.) On this pop-up window, Plaintiff had to either click the button that said "Create Account" or the

---

[10]     Compare these findings to the First Circuit in *Cullinane v. Uber Techs, Inc.* in which the court found the notice inadequate. 893 F.3d at 64 ("This notice was displayed in a dark gray small-sized non-bolded font against a black background. The notice simply did not have any distinguishable feature that would set it apart from all the other terms surrounding it."); *see also Meyer v. Kalanick*, 200 F. Supp. 3d 408, 414, 417, 422 (S.D.N.Y. 2016) (finding Uber's terms-of-service agreement not binding when the statement "was in a font that was barely legible on [a] smartphone device . . . [and] beneath two . . . additional buttons").

button labeled "Continue with Facebook." (Coyne Aff. ¶¶ 10-11.) Internal records show that Plaintiff proceeded by clicking the "Create Account" button. (Coyne Aff. ¶¶ 18, 23.) The pop-up window, as it would have appeared to Plaintiff in August 2017, appears below:



(Coyne Aff. ¶ 11.)

 *Directly* below the "Create Account" button, the popup window displayed an acceptance statement that read: "By creating a Zumper Account you indicate your acceptance to our Terms and Conditions and Privacy Policy." (Coyne Aff. ¶ 11.) The words "Terms and Conditions" and "Privacy Policy" appeared in a light blue color — to indicate hyperlinking — while the other words in the statement appeared black. (Coyne Aff. ¶¶ 11, 14.) The acceptance statement appeared in the same size and style font as the prompts used to direct a user to enter his name, email address and password. (Coyne Aff. ¶ 13.) Importantly, a user immediately saw the acceptance statement without having to scroll down. (Coyne Aff. ¶ 13.) Had a user clicked on

20

the blue hyperlinks, the website would have opened up a window in which he could have read the Agreement and privacy policy.[11] According to Zumper's records, Plaintiff clicked the "Create Account" button at 6:55 p.m. (EDT) on August 28, 2017. (Coyne Aff. ¶¶ 18, 23.) Ten minutes later, Plaintiff used Zumper to share a credit and background check with a realtor and paid fifty dollars with a credit card for the reports. (Coyne Aff. ¶¶ 32-33.)

The Zumper web browser presented to Plaintiff provided sufficient notice of the Agreement. The interface appeared clear and uncluttered. The phrases "Terms and Conditions" appeared in blue, indicating that Plaintiff could click a hyperlink to thoroughly read the Agreement. Furthermore, Plaintiff did not have to scroll down to see the disclaimer. "[T]he layout and language of the site g[ave] the user reasonable notice that a click will manifest assent to an agreement." *Meyer*, 868 F.3d at 75 (quoting *Sgouros*, 817 F.3d at 1033–34). Zumper clearly stated that "[b]y creating a Zumper Account you indicate your acceptance of our Terms and Conditions and Privacy Policy." (Coyne Aff. ¶ 11.) When Plaintiff clicked the "Create Account" button, he manifested assent to the Agreement, including the forum selection clause contained therein.

### iii.   **The Contract Does Not Fail for Impossibility.**

Plaintiff argues that, even if the Court were to find that Plaintiff entered into a valid agreement, the contract fails for impossibility. The Court disagrees. Plaintiff asserts that the Agreement proves unenforceable "since it contains conflicting terms which require Plaintiff to simultaneously litigate his claims in California courts and in arbitration." (Pl.'s Mem. at 13.)

---

[11]   Plaintiff argues that he could not have assented to the Agreement, because the acceptance statement references the "Terms and Conditions" while the Agreement bears the title "Terms of Use." (Pl.'s Mem. at 9.) However, he does not claim that he noticed the discrepancy in language, suffered any confusion, or even that he clicked on the "Terms and Conditions" hyperlink.

Defendant challenges this assertion and contends that the Agreement does not contain contradictory language. (Def.'s Reply at 17.) The Court finds Plaintiff's argument meritless.

The relevant portion of the Agreement reads:

> *Without derogation of the parties' obligation to arbitrate* as set forth herein, for any claims other than those in small claims court, jurisdiction for any court proceedings arising out of or relating to this Agreement, the Website or the Services shall be vested exclusively in, and venue shall be laid in, the state or federal courts sitting San Francisco, California.

(Agreement at 16-17 (emphasis added).) Indeed, the Agreement itself takes into consideration that plaintiffs cannot litigate and arbitrate at the same time. As Defendant correctly explain in his brief, "[w]hile most claims are arbitrable, the few that are not are still subject to venue in San Francisco." (Def.'s Reply at 17.) Moreover, the parties could waive arbitration or file suit to confirm any arbitration award, demonstrating that the two provisions can co-exist. Plaintiff entered into a valid contract and that contract does not fail for impossibility.

## B.    The Contract Contains a Valid Forum Selection Clause.

Since the Court finds that the parties have entered into a valid contract, the Court must next consider if the contract contains a valid forum selection clause.

### i.    *Standard of Review.*

When considering a forum selection clause, courts must first decide which law governs the enforceability of the clause. *Torres v. SOH Distribution Co.*, 2010 WL 1959248, at *2 (E.D. Va. May 13, 2010) (citing *Eisaman v. Cinema Grill Sys., Inc.*, 87 F. Supp. 2d 446, 448 (D. Md. 1999)). In cases involving federal question jurisdiction — as in the instant case — federal courts apply federal law. *Id.* (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 590 (1991)); *see also Albemarle Corp. v. AstraZeneca UK Ltd.,* 628 F.3d 643, 650 (4th Cir.

2010) ("[A] federal court interpreting a forum selection clause must apply federal law in doing so.")

A court must next consider whether the contract at issue contains a permissive or mandatory forum selection clause. "[F]ederal courts have found dispositive the particular language of the clause and whether it authorizes another forum as an alternative to the forum of the litigation or whether it makes the designated forum exclusive." *Abermarle Corp.*, 628 F.3d at 650. A mandatory forum selection clause contains "clear language showing that jurisdiction is appropriate only in the designated forum." *Garrett v. Gulf Stream Coach, Inc.*, 2009 WL 936297, at *2 (E.D.Va. Apr. 7, 2009); *see also Abermarle Corp.*, 628 F.3d at 650-51 (explaining that a forum selection clause that contains "specific language of exclusion" will be interpreted as mandatory and excluding venue elsewhere). Meanwhile, a permissive forum selection clause, sometimes referred to as a "consent to jurisdiction clause," authorizes certain jurisdictions and venues, but does not prohibit litigation elsewhere. *Abermarle Corp.*, 628 F.3d at 650-51. If a court decides that the clause is mandatory, "[f]ederal law presumes mandatory forum selection clauses to be prima facie enforceable for claims within their scope 'unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.'" *Torres*, 2010 WL 1959248, at *2 (quoting M/S *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).

The Fourth Circuit has held that:

> A [forum selection] clause is unreasonable if (1) it was the result of 'fraud or overreaching'; (2) 'trial in the contractual forum [would] be so gravely difficult and inconvenient [for the complaining party] that he [would] for all practical purposes be deprived of his day in court'; or (3) 'enforcement would contravene a strong public policy of the forum in which suit is brought.'

*Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 213–14 (4th Cir. 2007) (quoting *Bremen*,

407 U.S. at 15-18) (alterations in original); *see also Allen v. Lloyd's of London*, 94 F.3d 923, 928

(4th Cir. 1996) (explaining the same).

### ii. Analysis.

In the instant case, the forum selection clause at issue reads:

> Without derogation of the parties' obligation to arbitrate as set forth
> herein, for any claims other than those in small claims court, jurisdiction
> for any court proceedings arising out of or relating to this Agreement, the
> Website or Services *shall be vested exclusively in*, and *venue shall be* laid
> in, the state or federal courts sitting San Francisco, California.

(Agreement at 16-17 (emphasis added).) This contract contains a mandatory forum selection

clause. The clause includes "clear language" that demonstrates that the exclusive venue for any

unarbitrable claims lies in San Francisco — within the Northern District of California. *See*

*Garrett v. Gulf Stream Coach, Inc.*, 2009 WL 936297, at *2 (E.D. Va. Apr. 7, 2009) ("A

mandatory forum selection clause contains 'clear language showing that jurisdiction is

appropriate only in the designated forum.'") Indeed, the clause contains language such as "shall"

and "exclusively" that indicate that only certain courts are proper. *See Unistaff, Inc. v.

Koosharem Corp.*, 667 F. Supp. 2d 616, 619 (E.D. Va. 2009) ("Words such as 'shall,' 'only' or

'exclusive' are often indicators that a clause is mandatory rather than permissive."). Further, "[a]

crucial distinction between a mandatory clause and a permissive clause is whether the clause

only mentions jurisdiction or specifically refers to venue." *Gita Sports Ltd. v. SG Sensortechnik

GmbH & Co. KG*, 560 F. Supp. 2d 432, 436 (W.D.N.C. 2008) (internal quotations omitted).

Here, the forum selection clause specifically refers to venue. (Agreement at 16-17 ("[V]enue

shall be laid in . . . ").) For the above stated reasons, the Court finds that the Agreement includes

a mandatory forum selection clause.

Because the contract includes a mandatory forum selection clause, the Court must next consider its validity. As explained above, federal law presumes the validity of mandatory forum selection clauses, unless enforcement would be unreasonable under the circumstances. *Pee Dee Health Care, P.A.*, 509 F.3d at 213-14.

Based on a thorough review of the pleadings and the evidence presented, the Court finds no discernable allegations of fraud or overreaching. Although Plaintiff asserts that transfer to the Northern District of California would pose an undue financial and logistical burden on him, courts within this circuit and elsewhere have consistently held that "a party seeking to avoid a forum selection clause must prove more than the inconvenience of litigating in a distant forum." *Price v. Leasecomm Corp.*, 2004 WL 727028, at *4 (M.D.N.C. March 31, 2004); *see also The Hipage Co. v. Access2Go, Inc.,* 589 F. Supp. 2d 602, 612–13 (E.D. Va. 2008) ("[T]he Fourth Circuit has clearly stated that the expense of transporting witnesses is not sufficient to preclude enforcement of a forum clause." (citing *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1258 (4th Cir.1991))). Indeed, "[t]he party challenging a forum selection clause on the basis of inconvenience must demonstrate 'that the specified forum is so seriously inconvenient that he would be deprived of an opportunity to participate in the adjudication.'" *AC Controls v. Pomeroy Computer Resources, Inc.*, 284 F. Supp. 2d 357, 361 (W.D.N.C. 2003) (quoting *Mercury Coal & Coke, Inc. v. Mannesmann Pipe & Steel Corp.*, 696 F.2d 315, 317 (4th Cir. 1982)).

Furthermore, the Northern District of California is fully equipped to adjudicate an appropriate and fair trial. Indeed, the district recently litigated a nearly identical case involving Zumper. *Gonzalez-Torres v. Zumper, Inc.*, 2019 WL 6465283 (N.D. Cal. Dec. 2, 2019). Finally, enforcement of the forum selection clause will not contravene any strong public policy

of the Commonwealth of Virginia. *See, e.g., The Hipage Co., Inc.*, 589 F. Supp. 2d at 613

(finding that enforcement of forum selection clause in an internet service provider's contract

with a customer would not violate any strong Virginia public policy).

C.     **Transfer is Appropriate Under 28 U.S.C. § 1404.**

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the

interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought or to any district or division to which all parties have

consented."[12] Typically, in a case that does not involve a forum selection clause, a court

considering a motion to transfer pursuant to § 1404 evaluates and weighs the convenience of

both parties, as well as various public interest considerations. *Atl. Marine Const. Co. v. U.S.*

*Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 62 (2013). In considering a § 1404 motion, a

court generally considers "(1) the weight accorded to plaintiff's choice of venue; (2) witness

convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of*

*the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th

Cir. 2015).

The calculus changes, however, when the parties have entered into a contract that

contains a valid forum selection clause, which "represents the parties' agreement as to the most

proper forum." *Atl. Marine Const. Co.*, 571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh*

*Corp.*, 487 U.S. 22, 31 (1988)). Indeed, the Supreme Court has held that "[w]hen the parties

---

[12]     The parties do not contest that the case could have originally been brought in the
Northern District of California. Under 28 U.S.C. § 1391(b), an action may be brought in any
district in which a defendant resides or in a district in which a substantial part of the actions or
events giving rise to the claim took place. Zumper's headquarters are located in San Francisco
and, moreover, the events at issue substantially took place in California. (Coyne Aff. ¶¶ 2, 27-
35.)

have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause. Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." *Atl. Marine Const. Co,*, 571 U.S. at 62.

Because the parties have already agreed to a proper forum, the Court should typically only consider the public-interest factors, including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 64, n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6 (1981)). The Supreme Court further noted, however, that "[b]ecause those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64 ("Although it is 'conceivable in a particular case' that the district court 'would refuse to transfer a case notwithstanding the counterweight of a forum-selection clause,' such cases will not be common." (quoting *Stewart Org., Inc.*, 487 U.S. at 30-31)).

In the instant case, the Court finds no exceptional public policy factors exist that outweigh the presumption of enforcing the forum selection clause. Because the parties have not presented any extraordinary public policy issues that would overcome the presumption in favor of enforcing the forum selection clause, the Court finds a transfer of venue proper.

**D.       The Court Will Transfer the Entire Action.**

Because the Court finds that the Agreement include a valid mandatory forum selection clause, the Court must consider whether to transfer the entire action or only certain claims.[13]

---

[13]       Plaintiff does not appear to challenge the scope of the forum selection clause as it relates to Count I, Trade House's alleged violation of 15 U.S.C. § 1681e(b). The Court notes that those claims fall squarely within the terms outlined in the Agreement.   The Agreement vests exclusive

Plaintiff contends that even if he entered into a valid contract and agreed to the terms in the Agreement, Count Three, his 15 U.S.C. § 1681g claim, does not fall within the scope of the forum selection clause. (Pl.'s Mem. at 11-13.) He argues that the Court should sever Count Three. (Pl.'s Mem. at 13.) Zumper asserts that the Agreement encompasses all of Plaintiff's claims, including Count Three. (Def.'s Reply at 16.) Count Three alleges that "Zumper failed to provide Plaintiff any response to his written request for a copy of his consumer file in a timely manner, failed to disclose the source of the judgment information contained in his consumer report, and failed to identify each person that procured the Plaintiff's report." (Compl. ¶ 32.) Because the Court will transfer this action in its entirety, it need not determine whether the Agreement encompasses Plaintiff's § 1681g claim.

"Under § 1404(a), the court has authority only to transfer the entire civil action, not individual claims." *One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp.*, 312 F. Supp. 2d 824, 828 (E.D. Va. 2004); *see also Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1518-19 (10th Cir. 1991) ("Section 1404(a) only authorizes the transfer of an entire action, not individual claims."). Moreover, "[t]he decision whether to transfer an action [under section 1404(a)] is committed to the sound discretion of the district court." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 391 (E.D. Va. 2003). In exercising this discretion, the Court can and should consider "whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." *Glob. Touch Sols., LLC v. Toshiba Corp.*, 109 F. Supp. 3d 882, 889 (E.D. Va. 2015). "[T]he most prominent elements" of the interest of justice factor "are judicial economy and the avoidance of inconsistent judgments." *Id.* Here, the Court finds that the

---

venue in the Northern District of California for any claims "arising out of or relating to this Agreement, the Website or the Services." (Agreement at 16-17.)

avoidance of piecemeal litigation promotes judicial economy and gives the Court no reason to depart from the normal practice of transferring an entire action.[14] Given that the Court will transfer the entire action, it need not decide whether the Agreement encompasses all of Plaintiff's claims.[15]

## V.    CONCLUSION

For the reasons set forth above, the Court finds that a transfer of venue to the Northern District of California is proper. Therefore, the Court hereby GRANTS Zumper's Motion to Transfer Venue and hereby TRANSFERS this matter to the Northern District of California. Further, the Court DENIES WITHOUT PREJUDICE Trade House's Joinder in Motion to Stay Pending Arbitration. The Court declines to decide any further issues relating to this matter, including whether the case should be stayed pending arbitration.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically, notify all counsel of record and forward a copy to the Northern District of California.

/s/

David J. Novak
United States District Judge

Richmond, Virginia
Date: January 07, 2020

---

[14]    In a similar case involving a motion to transfer pursuant to 28 U.S.C. § 1406, the Court explicitly considered "the avoidance of piecemeal litigation" in its venue transfer analysis. *D'Addario*, 264 F. Supp. 2d at 393.

[15]    Likewise, the Court need not determine whether Trade House can enforce the arbitration clause in the Agreement. Accordingly, the Court will deny Trade House's motion without prejudice.